FARMERS COOPERATIVE ASSOCIATION, ST. EDWARD,
NEBRASKA, APPELLEE, V. BOONE COUNTY BOARD OF
EQUALIZATION, APPELLANT.
CEDAR VALLEY COOPERATIVE, APPELLEE, V. BOONE
COUNTY BOARD OF EQUALIZATION, APPELLANT.
FARMERS CO-OP EXCHANGE OF ELGIN, APPELLEE, V.
BOONE COUNTY BOARD OF EQUALIZATION, APPELLANT.
332 N.W.2d 32

Filed March 25, 1983. Nos. 44440, 44441, 44442.

Bernard L. McNary, Boone County Attorney, for appellant.

Larry D. Bird of Treadway & Bird, P.C., for appellees.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

KRIVOSHA, C.J.

This appeal involves three tax cases which were consolidated for trial in the District Court for Boone County, Nebraska, and for appeal in this court. The appellees, Farmers Cooperative Association, St. Edward, Nebraska (St. Edward), Farmers Co-op Exchange of Elgin (Elgin), and Cedar Valley Cooperative (Cedar Valley), are cooperatives which own and operate grain elevators and concomitant facilities in Boone County. The facilities at St. Edward and Elgin are located upon land owned by the cooperatives, while the Cedar Valley facilities at Primrose and Cedar Rapids are located upon land leased by the cooperative from a railroad. They appealed from orders of the county board of equalization of Boone County which increased actual values of their properties for the year 1980 over the valuations which had been set for the preceding year. The increases made by the board were founded upon two factors. In some cases the increase was occasioned by the removal or reduction of a factor previously allowed by the county and referred to in the record as "economic obsolescence." In some cases the increase was occasioned by the addition of improvements on the property which had been apparently omitted and unreported in earlier years. The cooperatives appealed to the District Court from the valuations set by the county board of equalization. Upon trial de novo in the District Court, the court

set aside the increases in valuation of both the St. Edward property and the Elgin property because it found the action of the board was void for want of proper notice under the provisions of Neb. Rev. Stat. § 77-1315 (Reissue 1981) and for want of a proper hearing under the provisions of Neb. Rev. Stat. § 77-1502 (Reissue 1981), and set the valuations at those of the previous year, that is, 1979. As to the property of Cedar Valley, it made a finding that the decision of the board and the order of the board increasing Cedar Valley's valuations should be reversed. The trial court found that the property of Cedar Valley should have been allowed the same economic obsolescence as other commercial property in the village of Primrose and the village of Cedar Rapids, which was 50 percent, and entered an order in conformity with its findings. However, the trial court allowed the addition of omitted property by the board and remanded the Cedar Valley case back to the board so as to permit the board to compute the appropriate economic obsolescence. For reasons set out herein, we reverse the decision of the trial court.

The record discloses that St. Edward has two parcels of land at issue here. Their combined actual valuation was increased from $46,050 for 1979 to $90,690 for 1980, nearly all of which, except for a 4 percent mandatory increase ordered by the State Board of Equalization and Assessment, was by reason of the board removing a 50-percent economic obsolescence factor previously given the property. The board also removed a bin which had previously been taxed and which apparently no longer existed.

The valuation of the Elgin facility at Petersburg was increased from $72,925 to $119,330, including the 4-percent increase ordered by the state board. The increase was mostly the consequence of reducing the economic obsolescence factor from 50 to 25 percent. The 25 percent was allowed because the elevator did not have access to rail facilities. Twenty-

five-percent economic obsolescence was also allowed on the omitted improvements. The actual valuation of Cedar Valley's Primrose facility was increased from $143,605 to $216,605 by the addition of omitted improvements, plus the state board's mandatory 4-percent increase. No economic obsolescence had previously been allowed on this property and none was allowed on the omitted improvements. The Cedar Rapids facility's valuation was increased from an actual value of $43,255 to $235,276, including the state board's 4-percent mandatory increase. This increase consisted of adding improvements not previously listed. Economic obsolescence was not granted to these values because none had previously been allowed. The issues raised in the District Court and in this court involve three in number. Two of the issues concern the procedure followed in making the changes in valuation. The third issue has reference to the proper allocation of economic obsolescence to the elevators.

The record made in the District Court establishes that early in the year 1980 the county assessor of Boone County and the county board of equalization determined that elevators in the county should be reexamined to determine if those elevators, including the ones owned by St. Edward and Elgin, should continue to receive depreciation for economic obsolescence. As already noted, not all elevators in the county, including the two owned by Cedar Valley, were previously given depreciation for economic obsolescence. The board asked for assistance from the office of the state Tax Commissioner. That office furnished an appraiser who inspected the properties. The state appraiser determined that the elevators were in fact fully functional and, except for Elgin, should not receive any depreciation for economic obsolescence. On April 18, 1980, notice of the increased assessments was given to the owners. Each notice stated the amount of change and the

reason for the change. For St. Edward and Elgin, the notice explained that the adjustment was due to the change in the depreciation factor for economic obsolescence, and for Cedar Valley it listed the addition of omitted property. The property owners were also advised of a hearing to be held on May 5, 1980, for the purpose of equalizing the omitted or undervalued property.

The cooperatives, either through their managers or their attorney, appeared at the May 5 hearing and objected to the increases because of the failure of the board to make the adjustments prior to April 1, 1980, as allegedly required by the provisions of § 77-1315. Neither the cooperatives nor the assessor presented any evidence at this hearing, and the hearing was recessed by the board.

On June 3, 1980, the board met again and the appraiser from the state met with them. The board questioned the appraiser and the county assessor, but no further evidence was presented and the board adhered to the changed valuations stated in the earlier notices sent to the cooperatives. The cooperatives did not receive notice of the June 3, 1980, meeting and did not appear.

Before proceeding to address the errors assigned by the county board, we deem it appropriate to note what is not involved in this case. This case is not one involving the question of whether the properties in question were assessed in excess of their actual value. No evidence was introduced by any of the parties regarding actual value. Rather, this is a case questioning whether the properties of the various elevators have been assessed uniformly and proportionately as required by the provisions of Neb. Const. art. VIII, § 1. The resolution of that question depends upon whether the county board was required to give to each of the elevators depreciation for economic obsolescence as referred to in a manual prepared by the Tax Commissioner. Before addressing that question, however, we turn first to

the procedural questions previously raised by the property owners and determined by the trial court.

St. Edward and Elgin maintained that the county board was without jurisdiction to act in this case because notice of the board's action in increasing the values of the various properties was not sent to property owners prior to April 1 of the taxing year, as required by the provisions of § 77-1315. We believe, however, that the property owners are in error with regard to this contention. It is true that § 77-1315 does require the *county assessor,* or the county clerk where he is ex officio county assessor, to complete his revision of the assessment rolls, schedules, lists, and returns and to file them with the county clerk on or before April 1 of each year. and to give notice of increased assessments to the owners before such filing. In this case, however, the adjustments were not made by action of the county assessor, and the provisions of § 77-1315 have no application as to notice. Rather, this is a case involving the board's direct authority over either the addition of omitted property or the increasing of undervalued property. The provisions of § 77-1502 apply, not § 77-1315.

Section 77-1502 first provides for a procedure whereby the county board, between April 1 and May 30, must hold a session of not less than 3 nor more than 60 days for the purpose of reviewing and deciding protests filed pursuant to §§ 77-1502 to 77-1507. It is clear from a reading of the statutes that this procedure arises as a result of protests filed by taxpayers in response to action taken by the county assessor prior to April 1, pursuant to § 77-1315. Section 77-1502, however, does not end at that point. It goes on to provide that in addition to the protest review meeting, "The board may meet at *any time* upon the call of the chairman or any three members of the board for the purpose of equalizing assessments of any omitted or undervalued property." (Emphasis supplied.)

In *Ewert Implement Co. v. Board of Equalization,*
160 Neb. 445, 70 N.W.2d 397 (1955), we examined that
very clause and pointed out that the authority of the
board to meet at any time was the result of an
amendment adopted in 1947 by the Nebraska Legis-
lature. In *Ewert* at 447-48, 70 N.W.2d at 399-400, we
said: "It appears to us that the authorities cited
by the plaintiff still apply to matters contemplated
by the first sentence of section 77-1502, R.S. Supp.,
1953. But as to the second sentence, the power of the
county board of equalization to deal with omitted
and undervalued property is greatly extended from
what it was prior to 1947. The county board of
equalization is authorized in terms by the second
sentence of section 77-1502, R.S. Supp., 1953, to
equalize assessments of omitted or undervalued
property. It is clear therefore that the second sen-
tence of section 77-1502, R.S. Supp., 1953, was in-
tended as an extension of the power of the county
board of equalization. The use of the words 'at any
time' therein certainly means that the assessment of
omitted or undervalued property may be dealt with
after the expiration of the 40 days and after July 1,
the date the county assessor is required to forward a
certified copy of the abstract of the assessment rolls
to the Tax Commissioner." We find nothing, either
in the applicable statutes or in any of our subsequent
decisions, to persuade us that the reasoning of the
*Ewert* decision is not correct. Obviously, when the
Legislature authorized the board to meet "at any
time," it meant at any time and did not intend to re-
quire the board to act prior to April 1, thereby de-
priving the board of a great deal of the authority just
given. We hold that under the provisions of § 77-1502
the county board of equalization may meet at any
time for the purpose of equalizing assessments of
any omitted or undervalued property and is not lim-
ited in its actions to property which the assessor has
adjusted prior to April 1 of the year in question.
Therefore, the fact that the adjustments to valuation

were made after April 1 or that St. Edward and Elgin did not receive notice under the provisions of § 77-1315 was of no significance in that such action and the notice thereof could occur at any time during the year. The trial court was in error in holding to the contrary.

We now turn to the second contention of the county board that the court erred in finding that the board did not give the appellees a proper hearing under § 77-1502. A reading of § 77-1502 does not disclose any requirement for a hearing. The board is authorized to add omitted property or adjust undervalued property on its own motion and without any prior hearing. The only hearing required to be given by the board is in connection with protests filed by taxpayers as a result of action taken by the county assessor. While this may appear to be an anomaly, it is the language of the statute and we are not at liberty to amend the statute. The issue, therefore, is not whether the county board failed to grant a hearing under the provisions of § 77-1502 before adjusting the values in question, but whether the action of the board in increasing the value of the appellees' property, either by adding omitted property or refusing to grant economic obsolescence, without further notice or a subsequent hearing before the board, denied to the appellees due process of law. We think not. The statutes of the State of Nebraska make it clear that one who is dissatisfied with the actions of the board may appeal to the District Court within 45 days after adjournment of the board. See Neb. Rev. Stat. § 77-1510 (Reissue 1981). The District Court is to hear such appeals as in equity and without a jury and is to determine anew all questions raised before the board which relate to the liability of the property to assessment, or the amount thereof. See, Neb. Rev. Stat. § 77-1511 (Reissue 1981); *Hastings Building Co. v. Board of Equalization,* 190 Neb. 63, 206 N.W.2d 338 (1973). That is to say, by reason of the provisions of the

Nebraska statute, appeals to the District Court are de novo and the property owner is afforded the opportunity in the District Court to introduce any and all relevant evidence for the purpose of establishing that the action of the county board was in error. In effect, the action of the county board is not final and binding, if appealed, until the District Court acts after affording the property owner a full due process hearing.

In *Frye v. Haas,* 182 Neb. 73, 152 N.W.2d 121 (1967), we were given the opportunity to review this very issue. In upholding a statute which allowed educational service units to levy a tax without it being certified by the county board, we said at 76-77, 152 N.W.2d at 124-25: ''The rule is stated in Nickey v. State of Mississippi, 292 U.S. 393, 54 S. Ct. 743, 78 L. Ed. 1323, as follows: 'There is no constitutional command that notice of the assessment of a tax, and opportunity to contest it, must be given in advance of the assessment. It is enough that all available defenses may be presented to a competent tribunal before exaction of the tax and before the command of the state to pay it becomes final and irrevocable. [Citations omitted.]'

''The application of this rule is well stated in 16A C.J.S., Constitutional Law, § 650(a) (2), p. 977, as follows: 'Due process is afforded if the taxpayer has an opportunity to question the validity or the amount of an assessment before the amount is determined, or at any subsequent proceedings to enforce its collection, or subsequent to collection in a suit for refund of taxes paid under protest, or at any time before liability for the tax becomes finally and irrevocably fixed.' ''

In *County of Douglas v. State Board of Equalization & Assessment,* 158 Neb. 325, 335, 63 N.W.2d 449, 457 (1954), we said: '' 'An owner is not deprived of his property without due process of law by means of taxation, if he has an opportunity to question its validity or the amount of such tax or assessment at

some stage of the proceedings, either before that amount is finally determined, or in subsequent proceedings for its collection.' '' See, also, *State ex rel. Douglas v. State Board of Equalization and Assm't,* 205 Neb. 130, 286 N.W.2d 729 (1979). While it ought to be apparent that giving notice to property owners by the county board before increasing the values should reduce unnecessary appeals and may oftentimes resolve disputes, absent a requirement by the Legislature that such hearing be held, and in light of the de novo hearing before the District Court, failure by the county board to afford the property owner a hearing does not deny to a property owner due process of law. To accept the appellees' position would be to expand the Administrative Procedures Act to cover county government. This the Legislature has refused to do. Neb. Rev. Stat. § 84-901(1) (Reissue 1981). See *County of Gage v. State Board of Equalization & Assessment,* 185 Neb. 749, 178 N.W.2d 759 (1970).

We believe that the trial court's finding that the board did not give the property owners a proper hearing under the provisions of § 77-1502 or, more importantly, denied to them due process of law was in error and must be reversed.

That leaves us, then, with the final question, whether the board acted arbitrarily with regard to the matter of economic obsolescence. In essence, the property owners maintain that the county board was *required* to grant economic obsolescence to the grain elevators by reason of guidelines previously promulgated by the Department of Revenue. Unfortunately for us, all of the regulations have not been introduced in evidence and are not before us. All that we have are selected sheets which do not tell us precisely how or in what manner the guidelines are to be administered. What we do have, however, does not support the contention that economic obsolescence was required to be given to the owners of the grain elevators simply by reason of the fact

that some commercial properties in the areas in which the elevators were located were also granted economic obsolescence. Page 157 of the Nebraska Cost Construction Manual reads in part as follows: "Unlike physical and functional factors, loss in value due to economic factors *usually* effects [sic] an entire neighborhood rather than individual properties." We have no disagreement with this language. We do not believe, however, that this language in any way compels the granting of economic obsolescence to every piece of property in an area which otherwise has been determined to suffer from economic obsolescence.

The guidelines further define economic obsolescence as "caused by factors outside the property," *Id.* at 182, as "the loss in value due to the effect of functional or economic factors. A condition of being out of date," *Id.* at 181, and as "influences of the district upon the property," *Id.* at 183. The evidence in this case supports the board's conclusion that while other businesses in the area may have suffered from economic obsolescence, the grain elevators have not. The grain elevators continue to perform their designated function, even though the surrounding areas have deteriorated. Farmers continue to bring their grain to the elevators without regard to what the rest of the community may look like and the elevators continue to receive rent for storage of government grain at the same rate. The evidence establishes that the elevators have not had any significant reduction in business.

The final provision urged upon us by the property owners as evidence of their right to economic obsolescence is found in the manual at page 185 and reads as follows: "Economic obsolescence is rarely curable. It attaches to a neighborhood and displays itself in conditions that surround a structure rather than in the actual buildings or property itself. The loss in value rate, when determined, applies to all structures in the area and is identified on the prop-

erty record card as an area allowance.'' It is apparent that the type of economic obsolescence referred to in this passage of the guidelines is due to the fact that an entire area becomes victim to economic obsolescence. However, where the particular buildings in question are one-purpose buildings, such as grain elevators, and are dependent not so much upon location but, rather, upon the function they may perform, then it is apparent that, absent other evidence, the withholding of economic obsolescence from a grain elevator located on a rail line cannot be said to be arbitrary or improper. This is further supported by a passage at page 182 of the manual which cautions the appraisers to ''make a thorough investigation of the economic background of *each individual property* in order to determine the degree of functional or economic obsolescence which exists.'' (Emphasis supplied.)

In essence, the property owners argue that the guidelines are law and *must* control both classification and value, regardless of the evidence. We think not. In the absence of other evidence, proof that the guidelines provided by the Tax Commissioner were applied raises a presumption that the assessment is legally proper. Where, however, evidence which establishes that following the guidelines will violate either the constitutional provisions requiring that property be taxed uniformly and proportionately or the statutory requirement that property be taxed at its actual value is introduced by either party, the guidelines must give way to the evidence.

The decision of the county board in removing or reducing economic obsolescence on the St. Edward and Elgin properties in question and withholding it from the two Cedar Valley properties is amply supported by the evidence in the record. The chief appraiser for the state testified that he personally examined and appraised each of the grain elevators and determined that economic obsolescence was not appropriate because, based on government storage

rates, the elevators did not measure a loss in economic rent. He said that economic rent is a more standard measure than is market sales. Appellees disputed this claim and contended that market sale methods should have been used. However, in. *Riha Farms, Inc. v. County of Sarpy,* 212 Neb. 385, 389, 322 N.W.2d 797, 800 (1982), we said: "Authorities charged with the duty of valuing property for taxation are not limited to just one method of determining value, and the ultimate question is whether the method used ultimately attains a reasonable degree of uniformity in value. Approximation of value and uniformity of taxation is all that can be accomplished, and substantial compliance with the requirement of equalization and uniformity of taxation laid down by the Constitution is all that is required."

And in *Bumgarner v. County of Valley,* 208 Neb. 361, 366, 303 N.W.2d 307, 310 (1981), we said: "In an appeal to the county board of equalization or to the District Court, and from the District Court to this court, the burden of persuasion imposed on the complaining taxpayer is not met by showing a mere difference of opinion unless it is established by clear and convincing evidence that the valuation placed upon his property when compared with valuations placed on other similar property is grossly excessive and is the result of a systematic exercise of intentional will or failure of plain duty, and not mere errors of judgment."

It cannot be said in this case that the guidelines promulgated by the Department of Revenue require the imposition of a depreciation factor which, if granted, would clearly undervalue the property in question. By its action, the county board in fact appears to have fulfilled its constitutional obligation of assessing grain elevators uniformly and proportionately throughout the county. The appellees have failed to prove that this treatment of grain elevators as a separate class violates the uniformity principles

as against all other property in the county. Therefore, the judgment of the trial court must be reversed and the cause remanded with instructions to enter a judgment reinstating the valuations as established by the county board of equalization.

REVERSED AND REMANDED WITH DIRECTIONS.

CLINTON, J., not participating.